# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

<table>
<tr><td>IMO THE ESTATE OF<br>ANASTASIOS G. NASTATOS</td><td>)<br>)<br>)<br>)</td><td>ROW Folio No. 167885 AF-SEM</td></tr>
</table>

## FINAL REPORT

Final Report: November 30, 2023
Date Submitted: July 19, 2023

Jason C. Powell, THE POWELL FIRM, LLC, Wilmington, Delaware; *Counsel for Exceptant Alex Whilby-Nastatos*.

Brian J. Ferry, FERRY JOSEPH, P.A., Wilmington, Delaware; *Counsel for Respondent Lexx Lazerman*.

Donald L. Gouge, DONALD L. GOUGE, JR., LLC, Wilmington, Delaware; *Personal Administrator of the Estate*.

Anthony Nastatos, Smyrna, Delaware; *Interested Party*

Kristina Nastatos, Newark, Delaware; *Interested Party*

**MOLINA, M.**

It is the unique privilege of this Court to oversee the administration of estates such as estates of persons with disabilities for whom this Court has appointed a guardian and estates of deceased Delawareans, shepherded by a representative appointed by the Register of Wills. Through these two exemplar buckets, the Court adjudges whether the fiduciaries are acting appropriately, issues appropriate relief, and advises upon future conduct. But it does so under different lenses. In the guardianship context, the Court acts as ultimate fiduciary for the person with a disability, who is a ward of the Court and whose best interest is the Court's primary consideration. In the probate context, the Court must expand its consideration to include the estate's beneficiaries and heirs.

This action arises in the probate context. Yet the familial tension long predates probate. It began (at least for this Court's purposes) in a hotly contested adult guardianship proceeding. Despite this Court's oversight and numerous adjudications, disputes persist to this day—approximately six (6) years after the ward's death. The time has come for closure and final resolution.

Through this report, I recommend that the administrator of late ward's estate begin taking concrete steps to close the estate. I find, based on the record developed at the evidentiary hearing, there is nothing left for probate, and it is in the best interest of the estate and its beneficiaries for the neutral administrator to file a final accounting, distribute the estate, and close this matter for good.

1

## I.  BACKGROUND[1]

This case arises from the administration of the estate of Anastasios Nastatos (the "Decedent"). According to the opening petition for this estate, the Decedent died on October 4, 2017, leaving behind four (4) children, Alex Whilby-Nastatos (the "Exceptant"), Kristina Nastatos, Anthony Nastatos (the "Interested Party"), and Lexx Lazerman (the "Respondent").[2]  Unfortunately, the Decedent also left behind long-standing disputes that continue to date.  I begin with a brief background of those disputes before turning to the issues at hand.

### A.  The Guardianship

In comparison to this Court's greater adult guardianship docket, the Decedent's guardianship was of a limited duration.  Then-Master Zurn appointed a guardian for the Decedent in June 2016, and he passed in October 2017.[3]  But the

[1] I take this background from the dockets of this action and related actions and the record developed at the evidentiary hearing held on April 13, 2023. *See* Docket Item ("D.I.") 73. I grant the evidence the weight and credibility I find it deserves. The exhibits submitted by the Exceptant (defined *infra*) are cited as "Ex__." *See* D.I. 68.

[2] D.I. 2. It remains in dispute whether the Decedent had another daughter, Ida Lazerman. *See* Pet. to Act as Personal Representative, No. 167885 AF-SEM (Del. Ch. July 20, 2021), ECF No. 66782501. In relying on the opening petition's recitation, I make no finding of paternity. *Cf. In re A.N.*, 2020 WL 7040079, at *18 n.1 (Del. Ch. Nov. 30, 2020) ("assum[ing] that every person who has presented himself or herself as the ward's biological child is doing so accurately[,]" without addressing accusations of lack of paternity).

[3] *In re A.N.*, 2020 WL 7040079, at *2, *4. The Exceptant was the guardian. To avoid any confusion, though, I herein use the generic term "the guardian" as I address the guardianship proceedings and the Guardianship Ruling (defined *infra*).

guardianship was heavily contested for the duration. And those contests continued after the Decedent passed. One contest continues to plague the Nastatos family: the sale of certain real property after the Decedent's death.[4]

On February 18, 2019, more than one (1) year after the Decedent passed, this now predominating issue was brought to Vice Chancellor Zurn's attention.[5] One of the Decedent's children informed Vice Chancellor Zurn that real property in which the Decedent had an interest had been sold on April 24, 2018 (after the Decedent's death but before the guardianship disputes were fully resolved).[6] The property was located at 515 South DuPont Highway, Dover, Delaware (the "Property") and the Decedent had owned the Property "through a wholly owned corporation, Dexalia,

---

[4] I do not attempt to summarize herein the many matters resolved by Vice Chancellor Zurn throughout the guardianship proceeding. *See, e.g.*, *In re A.N.*, 2020 WL 7040079. Avid readers may also be wondering why guardianship information is being published publicly. The Court's guardianship dockets are confidential, but the Court endeavors to anonymize and publish guardianship rulings of note and utility to the public. Vice Chancellor Zurn did just that, issuing her November 30, 2020 opinion in the guardianship matter publicly, with anonymized initializations for the parties. *In re A.N.*, 2020 WL 7040079. I direct interested readers to her decision for additional detail and only confirm the connection between the two matters because such is already of public record. *See, e.g.*, D.I. 14-15; *In re Nastatos*, C.A. No. 2021-0543-SEM (Del. Ch.), D.I. 1 (of which I take judicial notice under D.R.E. 202(d)(1)(C)).

[5] *In re A.N.*, 2020 WL 7040079, at *4.

[6] *Id.*

3

Inc."[7] But the sale was not a private sale initiated by any of the interested parties; rather, the Property was sold at auction through a monition action.[8]

Placed in the difficult position of determining a guardian's duties, and the Court's jurisdiction, during the period between a ward's death and the closure of the guardianship matter, Vice Chancellor Zurn drew careful lines in her November 30, 2020 decision (the "Guardianship Ruling"). Before the Decedent's death, Vice Chancellor Zurn found the court-appointed guardian was responsible for paying taxes on the Property.[9] By failing to do so, he breached his fiduciary duties to the Decedent and was held liable for such breach.[10] The guardian further breached his duty of candor to the Court by failing to inform the Court about the loss of the Property.[11] The Vice Chancellor entered judgment against the guardian as a sanction for his breaches.[12]

But Vice Chancellor Zurn stopped short of assessing liability for the guardian's failure to defend against the monition action. She held "to the extent [the guardian] owed such a duty [to defend], he did so outside the context of th[e]

---

[7] *Id.* at *2.

[8] *Id.* at *4.

[9] *Id.* at *5–7.

[10] *Id.* at *9–10.

[11] *Id.* at *13–14.

[12] *Id.* at *17.

guardianship action" because the action was commenced after the Decedent's death, which terminated the guardian's duties toward the Decedent's person and property.[13] Yet Vice Chancellor Zurn did find that the guardian "had a duty to preserve [the Decedent's] estate until he transferred it to the personal representative."[14]

Complicating the matter further was the record ownership of the Property. Prior to the sale, the Property was owned by Dexalia, Inc. (the "Company").[15] Vice Chancellor Zurn recognized that the Company "appear[ed] to be a holding company[,]" the Decedent was its registered agent, and there was some confusion as to "what stake [the Decedent] owned in [the Company]."[16] But Vice Chancellor Zurn declined to undertake an intrusive ownership inquiry "based on the unique facts of th[e] guardianship action," and treated the Property as the Decedent's property, subject to the guardian's oversight.[17]

The Delaware Supreme Court affirmed the Guardianship Ruling on appeal.[18]

---

[13] *Id.* at *10.

[14] *Id.* at *12.

[15] *Id.* at *2, *12 n.149.

[16] *Id.* at *2 n.9.

[17] *Id.*

[18] C.M. 18290-N-MTZ (Del. Ch. July 22, 2021), D.I. 379 (of which I take judicial notice under D.R.E. 202(d)(1)(C)).

## B.    The Estate

This estate was opened while the guardianship issues were still being resolved. They have proved no less controversial.

One month after the Decedent's death, on October 31, 2017, the Exceptant filed a petition for authority to act as personal representative of the Decedent's estate.[19] Soon thereafter, the Respondent filed a letter objecting to the appointment of the Exceptant.[20]

The Exceptant and the Respondent attempted to resolve their dispute over estate stewardship outside the courtroom. In December 2017, the Respondent requested more time from the Register of Wills to determine a personal representative for the estate because the Exceptant and the Respondent had reached an impasse.[21] That impasse, it appears, included the Decedent's other children taking sides through a letter writing campaign to the Register of Wills.[22]

Eventually, after numerous submissions, the Register of Wills directed the Exceptant and the Respondent, in January 2018, to either serve as joint administrators or select a neutral third-party.[23] After a few more months of dogged

---

[19] D.I. 3.

[20] D.I. 4.

[21] D.I. 6.

[22] *See, e.g.*, D.I. 7, 8, 10.

[23] D.I. 11.

resistance on both sides, they chose the latter and proposed in an April 24, 2018 letter that a local attorney, Donald Gouge, Esquire (the "Administrator") serve as administrator.[24]

On or around May 10, 2018, Mr. Gouge petitioned for authority to act as the personal representative; he was appointed on June 7, 2018. [25] The Administrator's inventory was due by September 7, 2018, and his first accounting was due by June 7, 2019.[26] At the Administrator's request, both deadlines were extended numerous times.[27] On March 12, 2019, the Administrator filed his inventory.[28] By December 2019, the Administrator filed his initial accounting (the "First Accounting").[29]

## C.     The Petition to Resign[30]

About six months after the Administrator filed the First Accounting, on June 21, 2021, the Administrator filed a petition to resign (the "Resignation Action").[31]

---

[24] D.I. 18.

[25] D.I. 23; D.I. 24; D.I. 27.

[26] D.I. 27.

[27] D.I. 29; D.I. 30; D.I. 36; D.I. 40.

[28] D.I. 33.

[29] Ex. 1.

[30] I take judicial notice of filings in the related proceeding before this Court captioned C.A. No. 2021-0543-SEM ("Resignation Action"). *See* D.R.E. 202(d)(1)(C).

[31] The following month, in July 2021, the Respondent petitioned for authority to act as the personal representative. Pet. to Act as Personal Representative, No. 167885 AF-SEM (Del. Ch. July 20, 2021), ECF No. 66782501. That petition does not appear to have been docketed but is, nevertheless, mooted by the recommendations herein.

The Administrator averred that "[s]everal heirs wish to sue [the guardian] over his handling of the guardianship" of the Decedent but that the Administrator believed such was "beyond the role [he] envisioned as administrator of the estate." [32] Interested parties responded and I heard oral argument on the petition on February 8, 2022 (the "Resignation Hearing"). [33]

At the Resignation Hearing, I questioned the Administrator on the rule I should apply to his request and he offered to provide further briefing on the subject. [34] Taking him up on that offer, I ordered supplemental briefing, to be submitted by February 17, 2022. [35] That briefing was timely filed. [36] I further directed the Administrator to file an interim accounting to reflect the latest level of estate assets and any additional claims, charges, or expenditures from the First Accounting. [37] Such was borne from my questions and was offered by the Administrator to "help tee up, then, any exceptions that may be filed, and maybe then that will go to the next step, is who has standing, then, to determine what, if any, cause of action may be lodged against [the guardian], rightly or wrongly." [38] At his offer and suggestion,

---

[32] Resignation Action D.I. 1, ¶¶7–8.

[33] *See, e.g.*, Resignation Action D.I. 5, 9, 12, 15.

[34] Resignation Action D.I. 25 at 13:11–17:24.

[35] *See* Resignation Action D.I. 20.

[36] Resignation Action D.I. 22.

[37] Resignation Action D.I. 25 at 18:1–21:20.

[38] *Id.* at 72:8–12.

I required the Administrator to file another accounting for the estate by February 28, 2022.[39] I shared his hope that any concerns would "be put on the record [in this estate proceeding] and can be dealt with" here.[40] The Resignation Action has remained stayed since.

### D. The Exceptions

Back in the estate, the Administrator timely filed the required second interim accounting (the "Second Accounting").[41] On May 26, 2022, the Exceptant filed exceptions to the Second Accounting, in which he disagreed with its characterization as an "interim" accounting.[42] The Respondent filed a response in opposition to the exceptions on August 18, 2022.[43] On October 3, 2022, the Administrator filed a neutral response in which he took no position.[44]

---

[39] *Id.* at 84:13–14.

[40] *Id.* at 87:8–11.

[41] Ex. 2–3. As of February 28, 2023, there was $221,406.32 in the escrow account at M&T Bank. Tr. 23:13–16.

[42] Ex. 4.

[43] Ex. 5.

[44] D.I. 57.

On October 5, 2022, the disputes pending in this action were assigned to me by the Chancellor.[45] By letter dated December 1, 2022, I scheduled a half-day evidentiary hearing for April 13, 2023 (the "Hearing").[46]

### E.    The Hearing

As I explained to the Parties in a March 27, 2023 letter, the Hearing was scheduled to address the Exceptant's exceptions to the Second Accounting and the Respondent's opposition to those exceptions.[47] At the Hearing, the Administrator and the Respondent testified, seven exhibits were admitted into evidence, and the Interested Party was in attendance.[48]

The Administrator explained he was able to secure, among other assets, the excess proceeds from the sale of the Property.[49] On August 20, 2019, the Administrator filed a petition for release of unclaimed proceeds of sheriff sale with the Superior Court.[50] In his petition, the Administrator noted the Company as the owner of the Property, but averred the estate had an interest in the proceeds because "[t]he corporation went void years ago, with the rights to the real property passing

---

[45] D.I. 58.

[46] D.I. 62.

[47] *Id.*

[48] D.I. 73; Tr. 71:21–22.

[49] Tr. 22:15–19.

[50] Ex. 9. I take judicial notice of filings in the related proceeding before the Superior Court captioned C.A. No. K19M-08-016 WLW ("Pet. Action"). *See* D.R.E. 202(d)(1)(C).

to Mr. Nastatos."[51] The Administrator attached to his petition the Secretary of State report reflecting the Company became void on March 1, 1993.[52] On October 7, 2019, the Superior Court granted the petition on the papers, finding the Administrator "the rightful claimant to the aforesaid funds[.]"[53] The funds were thus released to the Administrator and have been included in the estate.

Despite taking that action, the Administrator testified that he does not see future claims related to the Property as assets of the estate; rather he testified "[i]t really should be pursued by the heirs."[54] Otherwise, the Administrator testified that there were no additional assets to collect or liquidate.[55] But he conceded that the Second Accounting may need to be clarified and that his fees and costs will have increased after the Hearing.[56]

---

[51] Pet. Action D.I. 1 at 2.

[52] *Id.* at Ex. C.

[53] Pet. Action D.I. 3.

[54] Tr. 26:11–12. The Administrator provided additional reasons why he did not pursue claims related to the Property, including that he could be witness and the time and difficulty involved. *See, e.g.,* Tr. 52:15–24.

[55] Tr. 29:17–23.

[56] *See, e.g.,* Tr. 59:4–60:2.

Following the Hearing, the Parties were directed to submit closing briefs addressing the alleged claims that might exist for the estate to prosecute.[57] Briefing was complete on July 19, 2023, at which time I took this case under advisement.[58]

This is my final report.

## II. ANALYSIS

The parties' disputes present under the framework of accounting exceptions. With any estate accounting, heirs and beneficiaries are provided an opportunity to object to all or part of the accounting through exceptions. Under Court of Chancery Rule 198, "the personal representative [(here the Administrator)] bears the initial burden of demonstrating that the account was properly prepared."[59] If met, the Exceptant will need to present evidence to overcome the Administrator's showing.[60]

I first address the Respondent's argument that the exceptions are improper. I reject it, and find the exceptions are ripe for my review. I then turn to the

---

[57] Tr. 100:3–9. I also advised the Administrator that, because the estate would be extended for at least a couple months longer, transferring the estate proceeds into an account with higher-bearing interest, as he suggested, would be prudent. Tr. 106:15–23. The Administrator contacted M&T Bank on April 13, 2023 to secure a higher interest rate for the estate account. D.I. 74. To secure an even higher rate, he would have had to obtain a CD or place the funds in a money market account. *Id.* He did not pursue the latter choices because he may have to write checks out of the accounts on short notice. *Id.*

[58] D.I. 80.

[59] *In re Rich*, 2013 WL 5966273, at *1 (Del. Ch. Oct. 29, 2013).

[60] Rule 198 does provide for burden shifting if a surcharge is sought, but there is no such request before me.

Administrator's burden to prove the Second Accounting was properly prepared. I find he has met that burden and shift my consideration to whether the Exceptant has overcome that showing with sufficient evidence that the Second Accounting should be a final accounting. I find the Exceptant met his burden, and the Respondent has failed to present sufficient justification to keep this estate open. To bring this matter to an efficient close, I recommend that the Administrator be required to file a final accounting within ninety (90) days.[61]

## A. The exceptions are ripe for judicial review.

The Respondent argues that, because the Exceptant does not challenge the fees and costs reflected in the Second Accounting, the purported exceptions are not viable "exceptions." The Respondent further argues that the exceptions, by failing to identify dollar-and-cent challenges, fail to comply with Rule 197. I disagree on both points.[62]

First, I reject the Respondent's invitation to narrowly define what may constitute proper "exceptions" to an estate accounting. The right of estate heirs and

---

[61] Technically, the final accounting will provide an additional exception period but, with exceptions limited to only the items that have changed from the Second Accounting, I do not expect protracted proceedings. *See In re Chambers*, 2020 WL 3173032, at *4 (Del. Ch. June 12, 2020) (holding that exceptions that were, or could have been, raised in response to the first or final accountings may not be raised in response to future accountings).

[62] The Respondent also arguably waived this argument by failing to brief it in his initial response to the exceptions. D.I. 56. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived."). Nevertheless, I consider the argument on its merits.

beneficiaries to file exceptions derives from the Delaware Constitution, which provides:

> Exceptions may be made by persons concerned to both sides of every such account, either denying the justice of the allowances made to the accountant or alleging further charges against him or her; and the exceptions shall be heard in the Court of Chancery for the County; and thereupon the account shall be adjusted and settled according to the right of the matter and the law of the land.[63]

This right must be interpreted under the settled canons of constitutional construction:

> The Constitution and each part thereof must be harmonized and construed as a whole; that it cannot be presumed that any clause of the Constitution is intended to be without full force and effect. Indeed, such a rule is cardinal in our law. In addition, Delaware courts are charged to interpret the Constitution in a way to avoid producing an irrational result. That interpretation is not policy-driven, however; the ruling must come from the interrelationship of concepts set forth in the Constitution, the language of the Constitution, and the prior case law that has construed the Constitution.[64]

The Respondent would have me interpret "further charges" as purely monetary. But to do so would ignore the broader call to this Court to review exceptions and thereafter adjust and settle accountings "according to the right of the matter and the law of the land."[65]  Such implicates more than math, as demonstrated

---

[63] Del. Const., art. IV, § 32.

[64] *Higgin v. Albence*, 2022 WL 4239590, at *16 (Del. Ch. Sept. 14, 2022), *judgment entered*, (Del. Ch. 2022), *aff'd in part, rev'd in part*, 285 A.3d 840 (Del. 2022), *and amended*, (Del. Ch. 2022), *and aff'd in part, rev'd in part*, 285 A.3d 840 (Del. 2022) (cleaned up).

[65] Del. Const., art. IV, § 32.

in numerous rulings of this Court.[66] I find the right to file exceptions is not limited to monetary exceptions regarding the dollars and cents reflected on an estate accounting.

Second, the exceptions comply with Rule 197. Under Court of Chancery Rule 197, exceptions "shall be in writing" and must contain: (1) the name of the beneficiary filing exceptions; (2) the nature of the beneficiary's interest; and (3) "[a] list of the specific exceptions and the grounds for each exception." The Exceptant met this call and lobbed an exception to the Second Accounting's designation as an interim, rather than final, accounting. Such is a specific exception, for which the Exceptant also provided his grounds and argument. The Respondent may question those grounds, which I address later in this report, but they are not improper nor unworthy of judicial attention.

## B. The Second Accounting was properly prepared and the probate process is (nearly) complete.

Although the Administrator took a neutral stance in this action, Rule 198 dictates that "the personal representative [(here the Administrator)] bears the initial

---

[66] *See, e.g.*, *In re Childres*, 2021 WL 3283028, at *8 (Del. Ch. Aug. 2, 2021), *adopted sub nom. In re Childres* (Del. Ch. 2021) (addressing a non-monetized breach of fiduciary duty claim on its merits through the exceptions process); *In re Chambers*, 2020 WL 3173032, at *2 (addressing "itemization exceptions"); *In re Marvel*, 2018 WL 4762379, at *4 (Del. Ch. Oct. 1, 2018) (addressing corporate ownership through estate exceptions).

burden of demonstrating that the account was properly prepared." [67] The Administrator, through his testimony, met that burden.

The Administrator is "responsible for compiling the inventory of Decedent's estate, managing the Decedent's assets, and paying the Decedent's debts."[68] There is no dispute that the Administrator has completed these steps, nor is there any allegation that he has fallen short or erred in doing so. The amended inventory filed in February 2022 represents the total probate and non-probate assets of the Decedent's estate and none of the heirs have filed exceptions to that inventory.[69] Likewise, the Second Accounting has only been challenged insofar as it is labeled an "interim" accounting, rather than a final accounting. There has been no challenge to the assets, expenditures, or attorneys' fees listed on the Second Accounting.[70] Finally, the Administrator testified credibly, and with a proper foundation, that he believes there is nothing more required to probate the estate (other than to distribute

---

[67] *In re Rich*, 2013 WL 5966273, at *1.

[68] *Dixon v. Joyner*, 2014 WL 3495904, at *3 (Del. Ch. July 14, 2014).

[69] Exceptions were due no later than May 25, 2022. 12 *Del. C.* § 2102(c).

[70] Any such challenge was due no later than May 25, 2022. 12 *Del. C.* § 2102(c).

16

the residue to the heirs).[71]  As I explain further below, I agree.  The Administrator met his burden to prove the Second Accounting was properly prepared.[72]

## C.  The estate should be closed without delay.

Because the Administrator demonstrated the Second Accounting was properly prepared, the burden flips to the Exceptant to overcome that showing and demonstrate that the estate is ready for closure.  He succeeded in doing so.[73]

"Upon the filing of exceptions to an accounting, the Delaware Constitution provides that when exceptions are heard by the Court, 'the account shall be adjusted and settled according to the right of the matter and the law of the land.'"[74]  To determine if the Second Accounting should have been final, rather than interim, I am guided by several overarching principles of estate administration, including: (1)

---

[71] "An administrator is not required to make distributions to the beneficiaries before the estate is settled." *Dixon v. Joyner*, 2014 WL 3495904, at *3. Thus, the Administrator is appropriately waiting to take such step until the family's disputes are resolved.

[72] But the Administrator was candid during the Hearing about mathematical errors in the Second Accounting. Tr. 58:10–60:2. Such appear to be minimal and immaterial. Without any argument that those errors amount to an improper accounting (an argument that was required to be raised by May 25, 2022), I see no basis on which to fault the Administrator. 12 *Del. C.* § 2102(c). The errors will, no doubt, be corrected in the final accounting recommended herein.

[73] In so holding, I do not fault the Administrator for filing the Second Accounting as "interim." In doing so, he was following my direction in the Resignation Action, where I explained the Second Accounting would not "be an accounting that triggers closure of the estate, but [would] set forth where things stand . . . so everyone can get a look at that." Resignation Action D.I. 25, 84:15–18. But, based on the more developed record before me, I find the estate is ready for closure.

[74] *In re Rich*, 2013 WL 5966273, at *1.

17

that expenditures should serve the best interests of the estate;[75] (2) that the personal representative should protect and preserve the estate;[76] (3) that charges incurred should be "proportionate to a benefit that the estate receives or a detriment that the estate avoids[;]"[77] (4) that action is taken "in a timely manner so as to achieve a benefit (or avoid a detriment) for the estate[;]"[78] and (5) that estates should be settled, distributed, and closed promptly.[79] These principles are applied to judge whether a personal representative's choice to bring or defend suit was prudent and whether attendant fees are appropriately charged to the estate;[80] it follows that they may be applied to judge whether an estate ought to remain open to prosecute potential future litigation.

The Administrator and the Exceptant demonstrated that the estate, in the traditional sense, has completed probate. It is the Respondent who contends there is more to do. But what, precisely, that "more" is remains elusive. In the Resignation Action, the Respondent argued in opposition that: "the Estate indisputably has

---

[75] *Id.* at *4.

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] *Criscoe v. Derooy*, 384 A.2d 627, 629 (Del. Ch. 1978) (citation omitted).

[80] *See, e.g.*, *In re Clark*, 2019 WL 3022904, at *5 (Del. Ch. July 9, 2019) (explaining that attorneys' fees for investigating a wrongful death action—pursued for the benefit of the decedent's heirs and not the estate—were not properly charged to a decedent's estate).

standing to take legal action again [the guardian] for damage [the guardian] inflicted to assets of the Decedent."[81] In this action, the Respondent testified that he believed the estate should purpose claims against the guardian for the loss of the Property.[82] And finally, in his briefing after the Hearing, the Respondent argued the estate "has one monumental task remaining – a lawsuit against [the guardian] for his mismanagement of the assets and the corresponding loss of nearly $250,000 in assets."[83] But absent from these representations is the articulation of any specific claim(s) which the Respondent believes the estate should, or must, pursue.

The parties dispute what I should do with this deficiency. The Exceptant argues the lack of clarity supports conversion of the Second Accounting to a final accounting and closure of the estate. The Respondent counters that it would be inappropriate to prejudge future claims and that any substantive consideration would be an advisory opinion. I disagree with both approaches. Called upon to adjust and settle the Second Accounting "according to the right of the matter and the law of the land[,]"[84] I herein explore the potential future claims, to the best of my ability on the limited record before me. Thus, I address herein what, it appears, the Respondent

---

[81] Resignation Action D.I. 12 at p.4.

[82] *See, e.g.*, Tr. 83:22–23.

[83] D.I. 79 at p.14.

[84] Del. Const., art. IV, § 32.

seeks to prosecute regarding the loss of the Property.[85]  I see, and explore, three (3) avenues through which the estate could (arguably) pursue recovery: (1) a survival action under 10 *Del. C.* § 3701, (2) an action arising from 12 *Del. C.* § 3905(a), or (3) a receivership of the Company.[86]  Such exploration demonstrates that it is not in the estate's best interest to pursue any future litigation.[87]

### 1.    Any additional survival claims are precluded.

Under 10 *Del. C.* § 3701:

> [a]ll causes of action, except actions for defamation, malicious prosecution, or upon penal statutes, shall survive to and against the executors or administrators of the person to, or against whom, the cause of action accrued. Accordingly, all actions, so surviving, may be instituted or prosecuted by or against the executors or administrators of the person to or against whom the cause of action accrued.

---

[85] Although there were initial rumblings about what the parties termed the "Tucumbo Claim," I find any further argument waived by the Respondent's failure to brief the issue. *Emerald P'rs v. Berlin*, 726 A.2d at 1224 ("Issues not briefed are deemed waived.").

[86] In limiting my consideration to these theories, I reject the Respondent's argument that Vice Chancellor Zurn, in the Guardianship Ruling, issued a placeholder judgment in tacit (or explicit) support of the estate initiating litigation; I do not see any such forecasting in her careful parsing.

[87] In doing so, I reject the Respondent's argument that my consideration of future claims is an improper advisory opinion. The existence of collectable estate assets through future litigation is an actual controversy between the parties and is ripe for consideration. *See Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 479 (Del. 1989) (reiterating the four-part test for an actual controversy).

In the fiduciary-duty context, "[c]laims the principal may have for breach of fiduciary duty survive to the fiduciary of the principal's estate, not the beneficiaries of the principal's estate."[88]

At first blush, thus, a survival claim appears viable. But in the Guardianship Ruling Vice Chancellor Zurn already addressed fiduciary-duty claims arising before the Decedent passed. She found, in short, that the guardian "breached his fiduciary duty to [the Decedent] by failing to pay the taxes on the Property while [the Decedent] was alive" and awarded appropriate relief.[89] Her decision was affirmed by the Delaware Supreme Court and further litigation is precluded.[90]

### 2. An action under 12 *Del. C.* § 3905(a) would be fruitless.

Vice Chancellor Zurn reasoned that the guardian "had a duty to preserve [the Decedent's] estate until he transferred it to the personal representative."[91] Such duty, she found, arose from 12 *Del. C.* § 3905(a), which requires a court-appointed guardian to "deliver and pay to . . . the executors or administrators of the person with a disability all the property belonging to the person with a disability in the possession

---

[88] *Rende v. Rende*, 2023 WL 2180572, at *15 (Del. Ch. Feb. 23, 2023).

[89] *In re A.N.*, 2020 WL 7040079, at *15.

[90] *See Intrepid Invs., LLC v. London Bay Capital, LLC*, 2023 WL 4111072, at *4 (Del. Ch. June 21, 2023) ("[R]es judicata (or claim preclusion) 'applies not only to claims actually litigated but also to claims that could have been raised in prior litigation.'") (citations omitted).

[91] *In re A.N.*, 2020 WL 7040079, at *12.

21

of the guardian and all that shall be due to the person with a disability from the guardian[.]" But the Vice Chancellor questioned how such duty would be classified or delineated. I share her lack of certainty. But I nevertheless find the guardian was not required, under this cognizable duty, to defend against the sale of the Property.

It is undisputed that the Property was titled in the name of the Company. Also undisputed is that the Company's corporate taxes had not been paid for approximately thirty (30) years prior to the Decedent's death.[92] Such was confirmed in the Administrator's submissions to the Superior Court, which included a print-out from the Secretary of State's website showing the State considered the Company void.[93]

The Company was properly considered void. Under 8 *Del. C.* § 510, "[i]f any corporation . . . neglects or refuses for 1 year to pay the State any franchise tax or taxes, which has or have been, or shall be assessed against it, . . . the charter of the corporation shall be void, and all powers conferred by law upon the corporation are declared inoperative[.]" There is no dispute that the Company so neglected or refused and its charter was properly marked void as of March 1, 1993.[94]

---

[92] *See* Tr. 34:8–17.

[93] Pet. Action D.I. 1, Ex. C.

[94] *Id.*

Because the Company's charter was properly marked void, it was, as of 1993, a dissolved corporation.[95] Under 8 *Del. C.* § 278, dissolved corporations "shall nevertheless be continued, for the term of 3 years from such expiration or dissolution or for such longer period as the Court of Chancery shall in its discretion direct[.]" Such period is meant to enable the dissolved corporation "gradually to settle and close their business, to dispose of and convey their property, to discharge their liabilities and to distribute to their stockholders any remaining assets[.]"[96] "The suggestion that the act of dissolution in itself in some fashion works a forfeiture or extinguishment of a legal right, by analogy to the death of an individual, is . . . unsound."[97] Rather, the dissolved corporation may continue to act to wind up its affairs and "[i]f no such action is taken, the corporation continues to hold [undistributed] assets even after it is dissolved."[98]

Thus, when the Property was sold, it remained an asset of the Company. The Company was dissolved in 1993. It continued from the dissolution until March 1, 1996, after which time the wind-up period ended. With the wind-up concluded, and

---

[95] *Wuerfel v. F.H. Smith Co.*, 13 A.2d 601, 602 (Del. Ch. 1940).

[96] 8 *Del. C.* § 278.

[97] *Addy v. Short*, 89 A.2d 136, 139 (Del. 1952).

[98] *Surrey Park v. Riegel*, 2022 WL 17336095, at *4 (Del. Ch. Nov. 30, 2022) (citing *In re Krafft-Murphy Co.*, 82 A.3d 696, 704 (Del. Ch. 2013) ("After § 278's three year period expires, § 279 empowers the Court of Chancery to oversee and facilitate (by appointing a trustee or receiver) the completion of the dissolved corporations unfinished business," including by "tak[ing] charge of the corporation's property." (quoting 8 *Del. C.* § 279)).

the Property still undistributed, the Property continued to be held by the Company until it was sold through the monition action in 2018. The Company's ownership did not automatically terminate or transfer upon dissolution, or the Decedent's death.[99] Thus, the Property was not subject to, or within the scope of, the guardian's duty to preserve and transfer the Decedent's assets to the estate; it was, simply put, not the Decedent's asset. The estate, therefore, has no viable claim against the guardian for breach of the duties arising from 12 *Del. C.* § 3905(a).

### 3. Pursuing a receivership of the Company would not be in the estate's best interest.

The only option to recover for the Company's loss of the Property would be through a receivership action. As explained above, I find the Property was an asset of the Company when it was sold. Thus, as explained further below, any claims arising from the sale of the Property may be prosecuted only through a court-

---

[99] Nor did the treatment of the Property in the guardianship action alter its ownership. Although I agree with the Exceptant that the guardianship action is replete with uncontested averments that the Property was personally owned by the Decedent, such representations fall short of conclusively determining ownership. Vice Chancellor Zurn was also careful to explain she was treating the Property as the Decedent's property solely for the Guardianship Ruling. *In re A.N.*, 2020 WL 7040079, at *12 n.149. Further, I decline the Exceptant's invitation to sidestep the ownership question either as a matter (1) on which I can defer to the Administrator's reasoned judgment or (2) that was waived by the Respondent. Neither, I find, supports giving the issue short shrift or declining inquiry on whether the Property and any claims arising therefrom were or are assets of the estate. Such is a live controversy that must be addressed on its merits to bring this matter to a close.

appointed receiver. But having the Administrator or a successor administrator initiate a receivership action would not be in the estate's best interest.

To recover or dispose of assets retained after a dissolved company's wind-up period, the dissolved company needs a court-appointed receiver under 8 *Del. C.* § 279. Section 279 is meant to "empower[ ] the Court of Chancery to oversee and facilitate (by appointing a trustee or receiver) the completion of the dissolved corporation's unfinished business," including by "administering the 'still existing property interests of a dissolved corporation.'"[100] "[A]ny creditor, stockholder or director of the corporation, or any other person who shows good cause" may apply for a receiver.[101] Upon application, a receiver may be empowered "to prosecute and defend, in the name of the corporation, or otherwise, all such suits as may be necessary or proper" to "take change of the corporation's property, and to collect the debts and property due and belonging to the corporation[.]"[102]

Under this statutory scheme, an interested party would have needed to bring a receivership action to recover the Property prior to the sale; no such action was initiated, and the Property was sold, and the sale confirmed. The Superior Court has also conclusively determined the appropriate recipient of the excess proceeds from

---

[100] *In re Krafft-Murphy Co., Inc.*, 82 A.3d at 704 (citations omitted).

[101] 8 *Del. C.* § 279.

[102] *Id.*

that sale. Under 10 *Del. C.* § 4986, the Superior Court has discretion to dispose of sale proceeds "for the benefit of the parties interested," when the owner of the property sold cannot be located. Such is precisely what the Superior Court did; faced with unclaimed proceeds and the Administrator's petition seeking recovery, the Superior Court exercised its discretion to provide the proceeds to the Administrator for ultimate distribution to the Decedent's heirs.

But the Superior Court did not conclusively determine pre-sale ownership or any post-sale standing for claims arising from the sale. I reiterate my finding that the Property remained an asset of the Company and it follows that only the Company, through a receiver, would have standing to seek further recovery on the Company's behalf for the loss of the Property.[103] But this long-standing estate should not be further delayed to prosecute such action.

First, there is nothing left to distribute through a belated wind-up of the Company. The Property has been sold, that sale has been confirmed, and the proceeds distributed; those actions can no longer be challenged. And there is no

---

[103] In so holding, and for reasons already provided, I reject the Respondent's argument that the Guardianship Ruling acknowledged the standing of, or granted standing to, the estate to pursue future claims.

indication that other property exists. Thus, the necessary "good cause" for the appointment of a receiver to wind-up the Company's business is lacking.[104]

Second, to the extent the Respondent is arguing that the Company has viable litigation that the estate could pursue through a receivership, I disagree. Vice Chancellor Zurn determined that the guardian was responsible for protecting and preserving the Property while he served as guardian and until the Decedent's death. She was careful in articulating that responsibility as arising from his court-appointed position as guardian, rather than as an employee or officer of the Company. Put differently, she found the guardian took over (or, more so, should have taken over) the duties and responsibilities of the Decedent in managing the Company and particularly the Property. Any breach(es) of fiduciary duties that may have been owed to the Company would be attributable to the Decedent; estate surely cannot be expected to sue itself. Further, it is difficult to understand who, if anyone, owed what duty to the Company to preserve and protect the Property after the Decedent's death. It is not in the best interest of the estate and its beneficiaries to bear the burden of investigating and pursuing that issue further.

---

[104] *See, e.g.*, *In re Dow Chem. Int'l Inc. of Del.*, 2008 WL 4989069, at \*2 (Del. Ch. Nov. 18, 2008) (rejecting an argument that would require this Court to "appoint a receiver anytime a potential plaintiff states that a dissolved corporation may still hold assets").

**D.    The Administrator should file a final accounting.**

The Administrator has completed probate and it is time for a final accounting. The Exceptant argues that the Second Accounting should be converted to final. But because the Administrator (prudently) transferred estate assets to a higher-interest-bearing account after the Hearing and I expect the Administrator's fees and costs may have increased, the Administrator should promptly file a new final accounting before the estate is distributed and closed.

## III.    CONCLUSION

For the foregoing reasons, I find the Administrator met his burden to prove the Second Accounting was properly prepared. But the Exceptant also met his burden to prove that the Second Accounting should have been a final accounting. The Respondent has failed to rebut this showing nor convince this decisionmaker that the estate should remain open to pursue amorphous future litigation. To bring this matter to an efficient close, the Administrator should be required to file a final accounting with ninety (90) days of this becoming a final order of the Court. The estate should then be distributed and closed as promptly as possible after the exceptions period has expired, or further exceptions are resolved.

This is my final report and exceptions may be filed under Court of Chancery Rule 144.